O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

COLLEEN GRISEL,

              Plaintiff,

       vs.

CAROLYN W. COLVIN, Acting
Commissioner of Social
Security,

             Defendant.

Case No. CV 13-0623-JPR

MEMORANDUM OPINION AND ORDER
AFFIRMING THE COMMISSIONER

## I.   PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying her application for Social Security disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c). This matter is before the Court on the parties' Joint Stipulation, filed January 9, 2014, which the Court has taken under submission without oral argument.  For the reasons discussed below, the Commissioner's decision is affirmed and this

1

action is dismissed.

## II.  BACKGROUND

Plaintiff was born on September 29, 1958. (Administrative Record ("AR") 52.)  She has a 12th-grade education.  (AR 33, 54, 250.)  She previously worked as a supervising housekeeper.  (AR 31, 62.)

On November 14 and 19, 2008, respectively, Plaintiff filed applications for DIB and SSI, alleging that she had been disabled since September 13, 2004, because of "[s]evere depression, anxiety attacks, hepati[tis] c, bone spur on right foot, back problems, arthritis in lower spine, [and] acid reflux." (AR 78-81, 221-31, 245.)  After Plaintiff's applications were denied, she requested a hearing before an Administrative Law Judge.  (AR 115.)  A hearing was held on July 15, 2010, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert ("VE").  (AR 49-77.)  On September 23, 2010, the ALJ issued a written decision finding Plaintiff not disabled.  (AR 85-92.)  On October 19, 2010, Plaintiff requested review of the ALJ's decision.  (AR 168.)  On December 9, 2011, the Appeals Council granted the request for review, vacated the hearing decision, and remanded the case for further proceedings.  (AR 99-102.)

On July 23, 2012, a second hearing was held, before a different ALJ.  (AR 28-48.)  Plaintiff, who was represented by counsel, testified, as did her husband, Woodrow Grisel, and a different VE.  (Id.)  On July 26, 2012, the ALJ issued a written decision finding Plaintiff not disabled.  (AR 10-22.)  On August

2

21, 2012, Plaintiff requested review of the ALJ's decision.  (AR 6.)  On February 20, 2013, after considering new evidence submitted by Plaintiff, the Appeals Council denied review.  (AR 1-5.)  This action followed.

**III. STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. Id.; Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance.  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).  Moreover, "when the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence."  Brewes v. Comm'r of Soc. Sec. Admin., 682 F.3d 1157, 1163 (9th Cir. 2012); see also Taylor v. Comm'r of

3

Soc. Sec. Admin., 659 F.3d 1228, 1232 (9th Cir. 2011).  If the
evidence as a whole can reasonably support either affirming or
reversing, the reviewing court "may not substitute its judgment"
for the Commissioner's.  Reddick, 157 F.3d at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

     People are "disabled" for purposes of receiving Social
Security benefits if they are unable to engage in any substantial
gainful activity owing to a physical or mental impairment that is
expected to result in death or which has lasted, or is expected
to last, for a continuous period of at least 12 months.  42
U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257
(9th Cir. 1992).

     A.   The Five-Step Evaluation Process

     The ALJ follows a five-step sequential evaluation process in
assessing whether a claimant is disabled.  20 C.F.R.
§§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821,
828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first
step, the Commissioner must determine whether the claimant is
currently engaged in substantial gainful activity; if so, the
claimant is not disabled and the claim must be denied.
§§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not
engaged in substantial gainful activity, the second step requires
the Commissioner to determine whether the claimant has a "severe"
impairment or combination of impairments significantly limiting
her ability to do basic work activities; if not, a finding of not
disabled is made and the claim must be denied.
§§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant has a
"severe" impairment or combination of impairments, the third step

4

requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform her past work; if so, the claimant is not disabled and the claim must be denied.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The claimant has the burden of proving she is unable to perform past relevant work.  <u>Drouin</u>, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established.  <u>Id.</u>  If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). That determination comprises the fifth and final step in the sequential analysis.  §§ 404.1520, 416.920; <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

> B.   <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 13, 2004, the

---

[1]    RFC is what a claimant can do despite existing exertional and nonexertional limitations.  §§ 404.1545, 416.945; <u>see</u> <u>Cooper v. Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

1  alleged onset date.  (AR 13.)  At step two, the ALJ concluded

2  that Plaintiff had the severe impairments of "degenerative disc

3  disease of the back and mild chronic obstructive pulmonary

4  disease [("COPD")]."  (Id.)  The ALJ determined that Plaintiff's

5  hypertension, "alcohol withdrawal seizure," and mental

6  impairments were nonsevere (AR 13-15), findings Plaintiff does

7  not challenge.  At step three, the ALJ determined that

8  Plaintiff's impairments did not meet or equal any of the

9  impairments in the Listing.  (AR 15.)  At step four, the ALJ

10 found that Plaintiff had the RFC to perform "light work"[2] except

11 "she cannot push/pull with the lower extremities; she is limited

12 to performing postural activities occasionally except she is

13 prohibited from climbing ladders, ropes, or scaffolds; and she

14 must avoid exposure to pulmonary irritants, unprotected heights,

15 or dangerous machinery."  (AR 15-16.)  Based on the VE's

16 testimony, the ALJ concluded that Plaintiff could perform jobs

17 existing in significant numbers in the national economy.  (AR 20-

18 21.)  Accordingly, the ALJ determined that Plaintiff was not

19 disabled.  (AR 22.)

20 **V.   DISCUSSION**

21 

22      [2]  "Light work" involves "lifting no more than 20 pounds
   at a time with frequent lifting or carrying of objects weighing
23 up to 10 pounds."  20 C.F.R. §§ 404.1567(b), 416.967(b).  The
   regulations further specify that "[e]ven though the weight lifted
24 may be very little, a job is in this category when it requires a
   good deal of walking or standing, or when it involves sitting
25 most of the time with some pushing and pulling of arm or leg
   controls."  Id.  A person capable of light work is also capable
26 of "sedentary work," which involves lifting "no more than 10
   pounds at a time and occasionally lifting or carrying [small
27 articles]" and may involve occasional walking or standing.
   §§ 404.1567(a)-(b), 416.967(a)-(b).
28

Plaintiff alleges that the ALJ erred in assessing (1) the opinion of examining physician Bahaa Girgis, (2) her credibility, and (3) the lay testimony from her husband, Woodrow Grisel.  (J. Stip. at 3.)

A.   <u>The ALJ Properly Assessed Dr. Girgis's Opinion</u>

Plaintiff contends that "the ALJ's finding that Dr. Girgis was wrong about Plaintiff's need for frequent stops was based on [the ALJ's] lay opinion that a person with mild COPD could not need such a limitation."  (J. Stip. at 11.)  Plaintiff argues that the ALJ's finding "was not founded on any medical evidence of record" and that "no opinion at all" supported his finding.  (<u>Id.</u>)

1.   <u>Applicable law</u>

Three types of physicians may offer opinions in Social Security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (non-examining physicians)."  <u>Lester</u>, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician.  <u>Id.</u>

When an examining doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting <u>Lester</u>, 81 F.3d at 830-31).  When an examining physician's opinion conflicts with

7

1  another doctor's, the ALJ must provide only "specific and

2  legitimate reasons" for discounting it.  Id.  The weight given an

3  examining physician's opinion, moreover, depends on whether it is

4  consistent with the record and accompanied by adequate

5  explanation, among other things.  §§ 404.1527(c)(3),

6  416.927(c)(3).

7        2.  Relevant facts[3]

8      On June 29, 2006, an x-ray of Plaintiff's chest was normal.

9  (AR 329.)  On July 26, 2006, a lumbar-spine MRI showed "[g]rade 1

10 anterolisthesis of L5 on S1, probably degenerative";[4]

11 "[m]ultilevel degenerative disc disease and spondylosis resulting

12 in moderate-to-severe central canal stenosis at L4-5 and L5-S1";

13 and "[m]ild neural foraminal narrowing" at L4-5 and L5-S1.  (AR

14 283.)  On August 24, 2006, a lumbar-spine x-ray showed

15 anterolisthesis of L5 on S1 "likely secondary to facet

16 sclerosis," degenerative disc disease at L5-S1 and L1-S2, and

17 "[o]ld fracture of the left transverse process of L3."  (AR 315-

18 16.)

19     On February 27, 2009, Dr. Girgis, who was board certified in

20 internal medicine, performed an internal medicine evaluation of

21

22     [3]  Because the parties are familiar with the facts, they
23 are summarized here only to the extent relevant to the contested
   issues.

24     [4]  "In anterolisthesis, the upper vertebral body is
25 positioned abnormally compared to the vertebral body below it";
   specifically, "the upper vertebral body slips forward on the one
26 below."  Anterolisthesis, Cedars-Sinai, http://www.cedars-sinai.
   edu/Patients/Health-Conditions/Anterolisthesis.aspx (last
27 accessed Mar. 18, 2014).  The amount of slippage is graded on a
   scale from 1 to 4: "Grade 1 is mild (20% slippage), while grade 4
28 is severe (100% slippage)."  Id.

Plaintiff at the Social Security Administration's request.  (AR
356-61.)  Dr. Girgis noted that Plaintiff was in no acute
distress and "walks and moves easily."  (AR 357.)  Her lungs had
mild rhonchi, decreased breath sounds that were "clear to
ausculation and percussion," "[g]ood air movement," no wheezing
or rales, and normal expiratory phase.[5]  (AR 358.)  A pulmonary-
function test "revealed mild obstructive lung disease improved
after bronchodilator."[6]  (AR 360.)

     Dr. Girgis found that Plaintiff's back had no tenderness or
spasm, equal muscle tone throughout, and normal range of motion.
(Id.)  A straight-leg-raising test was negative at 90 degrees.
(Id.)  Plaintiff had normal range of motion of the neck, hips,
knees, ankles, shoulders, elbows, wrists, and hands; normal
reflexes; intact sensation; good motor tone; good active motion;
5/5 strength throughout; and no atrophy, fasciculation,[7] or motor

---

[5]     "Rhonchi are sounds that resemble snoring" and "occur
when air is blocked or becomes rough through the large airways."
Breath sounds, MedlinePlus, http://www.nlm.nih.gov/medlineplus/
ency/article/007535.htm (last updated Feb. 26, 2014).  "Rales are
small clicking, bubbling, or rattling sounds in the lungs" and
"are believed to occur when air opens closed air spaces."  Id.
Ausculation is a method of listening to breath sounds with a
stethoscope.  Id.

[6]     "Pulmonary function tests are a group of tests that
measure how well the lungs take in and release air and how well
they move gases such as oxygen from the atmosphere into the
body's circulation."  Pulmonary function tests, MedlinePlus,
http://www.nlm.nih.gov/medlineplus/ency/article/003853.htm (last
updated Feb. 26, 2014).

[7]     Muscle fasciculation, or twitching, "is caused by minor
muscle contractions in the area, or uncontrollable twitching of a
muscle group that is served by a single motor nerve fiber."
Muscle twitching, MedlinePlus, http://www.nlm.nih.gov/
medlineplus/ency/article/003296.htm (last updated Feb. 26, 2014).

deficits.  (AR 358-59.)  Her gait was normal, "not unsteady or unpredictable"; she could "change position and get on and off the examining table without difficulty"; and she required "[n]o assistive aid . . . for ambulation across the room."  (AR 360.)

Dr. Girgis diagnosed

> COPD due to long-term smoking. [Plaintiff] denies using oxygen or prednisone. She denies any recent hospitalizations or emergency room visits for COPD exacerbation. The lung examination today show decreased breath sounds but no expiratory wheezing or prolonged expiratory phase. Pulmonary function test today showed mild obstructive lung disease improved after bronchodilator.

(Id.) Dr. Girgis also diagnosed "[h]istory of generalized tonic clonic seizures"[8] – but noted that Plaintiff's "neurological examination today was unremarkable" – and "[h]istory of hypertension," noting that she might need an additional antihypertensive medication.  (Id.) Dr. Girgis concluded that Plaintiff was

> capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently. [She] can stand and walk 6 hours in an 8-hour workday with frequent stops. [Plaintiff] can sit 6 hours in an 8-hour workday.

---

[8]    "Generalized tonic-clonic seizure is a seizure that involves the entire body" and "is also called grand mal seizure." Generalized tonic-clonic seizure, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000695.htm (last updated Feb. 26, 2014).

(AR 360-61.)

On March 24, 2009, Dr. J. Lee[9] reviewed Plaintiff's medical records and completed a physical-residual-functional-capacity assessment.  (AR 383-87.)  Dr. Lee opined that Plaintiff had no exertional limitations, noting, "[s]ee . . . Int. Med. CE dated 2/27/2009."  (AR 384.)  He believed Plaintiff could never climb ladders, ropes, or scaffolds but could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  (AR 385.)  Dr. Lee indicated that Plaintiff needed to avoid "concentrated exposure" to fumes, odors, dusts, gases, poor ventilation, and hazards, noting "COPD, mild" and history of seizures, "probably due to alcohol withdrawal."  (AR 386.)  Dr. Lee also found that Plaintiff's alleged symptoms were "not supported by objective findings" and that Dr. Girgis's findings were not supported by the evidence because Plaintiff "has FROM, sensation/strength," — presumably, full range of motion, sensation, and strength — and there was "no indication as to why exertional impairments [sic]." (AR 386-87.)

On July 9, 2009, Dr. Joel Ross, a neurologist,[10] reviewed

---

[9]    Dr. Lee's electronic signature includes a medical specialty code of 47, indicating "other."  (AR 387); see Program Operations Manual System (POMS) DI 26510.089, U.S. Soc. Sec. Admin. (Oct. 25, 2011), http://policy.ssa.gov/poms.nsf/lnx/ 0426510089; POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug. 29, 2012), http://policy.ssa.gov/poms.nsf/lnx/0426510090.

[10]   Dr. Ross's electronic signature includes a medical specialty code of 20, indicating neurology.  (AR 404); see Program Operations Manual System (POMS) DI 26510.089, U.S. Soc. Sec. Admin. (Oct. 25, 2011), http://policy.ssa.gov/poms.nsf/lnx/ 0426510089; POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug. 29, 2012), http://policy.ssa.gov/poms.nsf/lnx/0426510090.

Plaintiff's medical records and completed a physical-residual-functional-capacity assessment.  (AR 399-404, 410.)  Dr. Ross noted that Plaintiff's primary diagnoses were low-back pain from degenerative disc disease and degenerative joint disease at L4-5 and L5-S1, "[a]lcohol [a]buse with Hep C (asymptomatic)," and "withdrawal seizures."  (AR 399.)  He noted that Plaintiff's "secondary" diagnoses were tobacco abuse and COPD but that a chest x-ray and pulmonary function tests had been negative.  (Id.)  Dr. Ross opined that Plaintiff could lift 10 pounds frequently and 20 pounds occasionally, stand or walk with normal breaks for about six hours in an eight-hour day, and sit with normal breaks for about six hours in an eight-hour day.  (AR 400.)  Plaintiff could never push or pull with her legs or climb ladders, ropes, or scaffolds, but she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  (AR 400-01.)  Dr. Ross believed that Plaintiff needed to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, and all exposure to hazards.[11]  (AR 402.)  Dr. Ross noted Dr. Girgis's finding that Plaintiff was limited to lifting and carrying "10-20#," sitting "6/8h," and standing and walking

_____

[11]    Elsewhere in his opinion, Dr. Ross specifically noted that Plaintiff's history of seizures resulted in the limitations of no heights or driving at work; her hypertension resulted in the limitations in lifting, sitting, standing, and walking; her gastroesophageal reflux disease resulted in the limitations to occasional bending, stooping, squatting, kneeling, and crawling; her low-back pain resulted in the limitations of no pushing or pulling, in addition to the previously described limitations; and her "COPD/emphysema" resulted in the limitations of "no dust fumes or industrial strength chemicals," also in addition to the previously described limitations.  (AR 403.)

"6/8h" and stated that he "agree[d]" with that assessment, that his assessment with "consistent with" it, and that Dr. Girgis's opinion was the "basis of this RFC." (AR 403.) He did not specifically mention Dr. Girgis's requirement of frequent stops when walking. Dr. Ross also noted that Dr. Girgis's report "fails to support [Plaintiff's] claims of disability to the extent she portrays to SSA." (Id.)

On May 4, 2012, Dr. Vicente R. Bernabe, D.O., a board-certified orthopedic surgeon, performed a complete orthopedic consultation of Plaintiff at the Social Security Administration's request. (AR 452-62.) Dr. Bernabe noted that Plaintiff appeared to be in "no acute or chronic distress" and could move "freely in and out of the office and around the examination room without the use of any assistive device." (AR 453.) Plaintiff's gait was "normal without ataxia or antalgia," she was able to toe and heel walk, she did not use any assistive device to walk, and she had normal swing and stance phases. (Id.) Plaintiff's cervical spine displayed "no significant tenderness to palpation" or "visible or palpable spasm," and it had full and painless range of motion. (AR 454.) Examination of Plaintiff's thoracic spine was "unrevealing," and she had no tenderness. (Id.) Plaintiff's lumbar spine was tender with spasm on the right side; she had flexion of 40 degrees, extension to 10 degrees, side bending to 10 degrees, and rotation to 40 degrees to the left and 45 degrees to the right. (Id.) Straight-leg-raising was negative in the supine and seated positions. (Id.) Plaintiff had full and painless range of motion of the shoulders, elbows, wrists, hands, hips, knees, ankles, and feet. (AR 454-55.) Motor strength was

13

5/5 in the upper extremities and 4/5 in the lower extremities, "with weakness in the hip flexors and extensors." (AR 455.) Reflexes were 2/4 in the upper extremities and 1/4 in the lower. (Id.) Sensation in her upper and lower extremities was "well preserved." (Id.)

Dr. Bernabe noted that x-rays of the lumbar spine that day showed

> a mild lumbar scoliosis. There is a 5 mm anterolisthesis of L5 on S1. There is severe degenerative disc disease at the T11-T12 and T12-L1 with subchondral sclerosis and significant narrowing of the intervertebral disc spaces. There is straightening of the lumbar lordosis. There are anterior osteophytes. No compression fracture or dislocation is seen.

(Id.) He diagnosed degenerative disc disease of the lumbar spine and thoracolumbar and lumbrosacral musculoligamentous strain. (Id.) Dr. Bernabe opined that Plaintiff could lift and carry 25 pounds frequently and 50 pounds occasionally, walk and stand for two hours at a time and a total of six hours, and sit two hours at a time and a total of six hours. (AR 456-58.) She could frequently push and pull, walk on uneven terrain, climb ladders, work at heights, bend, stoop, and crawl. (AR 456.) Plaintiff could never work at unprotected heights but could frequently operate a motor vehicle and tolerate pulmonary irritants, extreme temperatures, humidity and wetness, and vibration. (AR 461.) She did not need a cane or other assistive device to ambulate. (AR 456, 458.) Dr. Bernabe opined that Plaintiff could shop, travel alone, walk without a wheelchair or walker, walk a block

14

1  at a reasonable pace on uneven surfaces, use public
2  transportation, climb steps, prepare simple meals, care for her
3  own personal hygiene, and handle paper files.  (AR 462.)

4       In his July 2012 decision, the ALJ accurately summarized the
5  medical evidence and accorded "significant weight, but not full
6  weight," to the opinions of Drs. Girgis, Lee, Ross, and
7  Bernabe.[12]  (AR 19.)  The ALJ explained,

8           These opinions are all somewhat reasonable and supported
9           by the record as a whole.  These opinions are consistent
10          with  Dr.  Girgis'  report  that  [Plaintiff]  had  no
11          tenderness  to  palpitation  [sic]  over  the  midline  and
12          paraspinal  area,  had  a  negative  result  from  the  straight
13          leg  raise  test,  had  normal  range  of  motion  of  the  back,
14          had  a  normal  gait,  and  was  able  to  move  about  the
15          examination  room  without  difficulty.   Further,  these
16          opinions  are  supported  by  the  mild  findings  from  the
17          pulmonary  functioning  test.   No  single  assessment  has
18          been  completely  adopted  as  the  residual  functional
19          capacity  determined  herein.   In  particular,  the
20          undersigned  finds  that  the  consultative  examiners
21          overestimated  [Plaintiff's]  exertional  capacity  by  not
22          adequately  considering  the  claimant's  subjective

23    _____

24    [12]     Two of Plaintiff's treating physicians, Drs. Sidney S.
      Wu and James Evans, completed check-off forms regarding
25    Plaintiff's physical limitations (AR 438-40, 480-82), but the ALJ
      accorded those opinions "little weight" because they were "brief,
26    conclusory, . . . inadequately supported by clinical findings,"
      and "inconsistent with substantial evidence," including Dr.
27    Girgis's examination findings and the pulmonary function test (AR
      19).  Because Plaintiff does not challenge the ALJ's rejection of
28    those opinions, the Court does not address them.

1    complaints.   Further,   Dr.   Girigs' [sic] finding that
2    [Plaintiff] needed frequent stops is given little weight
3    because   it   is   inconsistent   with   his   mild   findings
4    regarding [Plaintiff's] COPD and back impairments.   The
5    undersigned has adopted those specific restrictions on a
6    function-by-function basis that are best supported by the
7    objective evidence as a whole.
8    (AR 19 (citations omitted).)
9            3.   Discussion

10        Plaintiff contends the ALJ erred in rejecting Dr. Girgis's
11   "material contingency" that Plaintiff could walk for six hours in
12   an eight-hour day "only if permitted to make frequent stops."
13   (J. Stip. at 5.)   As Plaintiff acknowledges (id.), the ALJ
14   credited Dr. Girgis's other findings by limiting her to only a
15   limited range of light work (AR 15-16, 19).   Because Dr. Girgis's
16   opinion that Plaintiff needed to make "frequent stops" conflicted
17   with the opinions of Drs. Lee, Ross, and Bernabe, none of whom
18   found any similar limitation (see AR 383-87, 399-404, 452-62),
19   the ALJ was required to provide only "specific and legitimate"
20   reasons for rejecting that portion of Dr. Girgis's opinion.   See
21   Carmickle, 533 F.3d at 1164.   As discussed below, the ALJ's
22   findings met that requirement.

23        The ALJ permissibly discounted Dr. Girgis's finding that
24   Plaintiff needed to make "frequent stops" when standing and
25   walking because it was "inconsistent with his mild findings
26   regarding [Plaintiff's] COPD and back impairments."   (AR 19); see
27   20 C.F.R. §§ 404.1527(c)(3)-(4) (greater weight accorded to
28   opinion that is supported by relevant evidence, such as medical

16

signs and laboratory findings, and more consistent with record as
whole), 416.927(c)(3)-(4) (same).   Indeed, Dr. Girgis found only
"mild" COPD that "improved" after Plaintiff used a bronchodilator
and that didn't cause abnormal test results.[13]  (AR 360.)  He
specifically noted that she had no "acute respiratory illness."
(AR 362.)  Dr. Girgis also noted that Plaintiff's back was
nontender with a normal range of motion (AR 358) and that she had
a normal gait and no difficulty changing position or getting on
and off the examining table (AR 360).   Such mild findings fail to
support Dr. Girgis's opinion that Plaintiff required "frequent
stops" while walking and standing.   See Batson v. Comm'r of Soc.
Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ may
discredit medical opinion that is "conclusory, brief, and
unsupported by the record as a whole, or by objective medical
findings" (citation omitted)); §§ 404.1527(c)(3) ("The more a
medical source presents relevant evidence to support an opinion,
particularly medical signs and laboratory findings, the more
weight we will give that opinion."), 416.927(c)(3) (same).

_____

[13]    Plaintiff's pulmonary function tests showed that her
"FVC Liters" was 113% of the predicted amount before using a
bronchodilator and 102% after, and her "FEV1 L/Sec" was 87% of
the predicted amount before using a bronchodilator and 92% after.
(AR 360.)  "FVC," or "forced vital capacity," measures the amount
of air a person can exhale with force after inhaling as deeply as
possible.  Lung function tests, WebMD, http://www.webmd.com/lung/
lung-function-tests (last updated Apr. 25, 2013).  "FEV," or
"forced expiratory volume," measures the amount of air a person
can exhale with force in one breath.  Id.  The amount of air
exhaled "may be measured at 1 second (FEV1), 2 seconds (FEV2), or
3 seconds (FEV3)."  Id.  "A value is usually considered abnormal
if it is less than 80% of [the] predicted value."  Pulmonary
function tests, MedlinePlus, http://www.nlm.nih.gov/medlineplus
/ency/article/003853.htm (last updated Feb. 26, 2014).

1    The ALJ was also entitled to rely on Drs. Lee's and Ross's

2    opinions regarding Plaintiff's COPD-related limitations instead

3    of Dr. Girgis's.  Dr. Lee opined that Plaintiff's mild COPD and

4    history of withdrawal seizures resulted only in limitations to

5    avoiding "concentrated exposure" to fumes, odors, dusts, gases,

6    poor ventilation, and hazards.  (AR 386.)  Dr. Lee acknowledged

7    that his opinion conflicted with Dr. Girgis's but explained that

8    Dr. Girgis's finding was not supported by the evidence because

9    Plaintiff had full range of motion, sensation, and strength, and

10   there was "no indication as to why [Dr. Girgis found she had]

11   exertional limitations."[14]  (AR 387.)  Moreover, Dr. Ross

12   specifically noted Plaintiff's "COPD/emphysema (tobacco abuse),"

13   stating that it was treated with "Spiriva and Xopenex";[15] that an

14   examination had revealed "decreased BS," presumably, breath

15   sounds; and that a June 2006 chest x-ray was negative.  (AR 403.)

16   Dr. Ross found that Plaintiff could sit six hours and stand or

17   walk six hours in an eight-hour day but should avoid exposure to

18

19   [14]    Plaintiff is thus incorrect when she asserts that Dr.
20   Lee addressed only the orthopedic limitations.  (J. Stip. at 10-
     11.)  Dr. Lee specifically referred to Dr. Girgis's entire report
21   (AR 384), and his statement discounting the report because it
     contained "no indication as to why [she had] exertional
22   limitations" (AR 387) applies equally to the COPD findings.

23   [15]    Spirivia, or tiotropium, and Xopenex, or levalbuteral,
     are bronchodilators that "work[] by relaxing and opening the air
24   passages to the lungs to make breathing easier."  Tiotropium Oral
     Inhalation, MedlinePlus, http://www.nlm.nih.gov/medlineplus/
25   druginfo/meds/a604018.html (last updated Mar. 16, 2011);
     Levalbuterol Oral Inhalation, MedlinePlus, http://www.nlm.nih.
26   gov/medlineplus/druginfo/meds/a603025.html (last updated Sept. 1,
     2010); see also Levalbuterol (Inhalation Route), Mayo Clinic,
27   http://www.mayoclinic.org/drugs-supplements/levalbuterol-inhalati
     on-route/description/drg-20067232 (last updated Nov. 1, 2013).
28

"dust[,] fumes[,] or industrial strength chemicals." (Id.)  The ALJ was entitled to credit Drs. Lee's and Ross's opinions because unlike Dr. Girgis, they reviewed Plaintiff's medical file before rendering their opinions.  (See AR 16 (ALJ's RFC limitation to "avoid exposure to pulmonary irritants"); AR 357 (Dr. Girgis's notation that he reviewed "[n]o medical records"), 388-90 (case analysis listing medical evidence and electronically signed by Dr. Lee), 403 (Dr. Ross's summary of medical evidence and resulting functional limitations)); §§ 404.1527(c)(3) (in weighing medical opinions, ALJ "will evaluate the degree to which these opinions consider all of the pertinent evidence in [claimant's] claim, including opinions of treating and other examining sources"), 416.927(c)(3) (same).

Indeed, Drs. Lee and Ross noted several other medical records, including Plaintiff's normal chest x-ray in June 2006, her July 2006 lumbar-spine MRI results, and her August 2006 lumbar-spine x-ray results (AR 388-89, 403), that supported their assessments.  Plaintiff also had a normal lung examination in September 2008.  (AR 287.)  And as Dr. Girgis himself noted, Plaintiff did not use oxygen or prednisone.  (AR 356-57.)  Finally, Plaintiff never testified at either hearing that she had shortness of breath when walking.[16]  The ALJ was therefore also entitled to rely on those portions of Drs. Lee's and Ross's opinions because they were consistent with other clinical findings and the record evidence.  See Thomas v. Barnhart, 278

---

[16]     To the contrary, Plaintiff testified that she only "[s]ometimes" had breathing problems and that they got worse when she was "laying down."  (AR 61.)

1   F.3d 947, 957 (9th Cir. 2002) ("The opinions of non-treating or

2   non-examining physicians may also serve as substantial evidence

3   when the opinions are consistent with independent clinical

4   findings or other evidence in the record."). Any conflict in the

5   properly supported medical-opinion evidence was "solely the

6   province of the ALJ to resolve." <u>Andrews v. Shalala</u>, 53 F.3d

7   1035, 1041 (9th Cir. 1995).[17]

8       Plaintiff contends that in assessing her RFC, the ALJ

9   "merely made a leap from the medical evidence that Dr. Girgis,

10  with his medical expertise[,] did not – that a person with mild

11  COPD like Plaintiff's has an unrestricted ability to stand and

12  walk for up to six hours a day." (J. Stip. at 6.) Plaintiff

13

14  _____

15  [17]   Plaintiff contends that Drs. Lee's and Ross's opinions
    cannot constitute substantial evidence supporting the ALJ's RFC
16  assessment because "[a] non-examining physician's opinion is
    insufficient standing alone, 'particularly in view of the
17  conflicting observations, opinions, and conclusions of an
    examining physician.'" (J. Stip. at 9 (quoting <u>Pitzer v.</u>
18  <u>Sullivan</u>, 908 F.2d 502, 506 n.4 (9th Cir. 1990).) But in the
    cases Plaintiff relies on for support, either "nothing in the
19  record" supported the nonexamining physician's opinion,
    <u>see</u> <u>Pitzer</u>, 908 F.2d at 506 n.4, or the opinion was "directly
20  contradicted by the record," <u>Hill v. Astrue</u>, 698 F.3d 1153, 1161
    (9th Cir. 2012). Here, by contrast, the nonexamining doctors'
21  opinions, unlike Dr. Girgis's, were supported by and consistent
    with the medical evidence. <u>See</u> <u>Andrews</u>, 53 F.3d at 1041 ("when
22  it is an examining physician's opinion that the ALJ has rejected
    in reliance on the testimony of a nonexamining advisor, reports
23  of the nonexamining advisor need not be discounted and may serve
    as substantial evidence when they are supported by other evidence
24  in the record and are consistent with it" (emphasis omitted)).
    Moreover, Drs. Lee's and Ross's opinions were generally
25  consistent with that of examining Dr. Bernabe, who concluded that
    Plaintiff could walk and stand for two hours at a time and a
26  total of six hours in an eight-hour day and could "frequently" be
    exposed to dust, odors, fumes, and pulmonary irritants. (AR 456,
27  458, 461.)
28

1   contends that the ALJ "does not have the expertise" to form such
2   a "medical opinion." (Id.) It is true that an ALJ may not
3   substitute his own opinion for a doctor's professional
4   interpretation of clinical testing. See Day v. Weinberger, 522
5   F.2d 1154, 1156 (9th Cir. 1975) (noting that hearing examiner
6   erred by failing to "set forth any specific reasons for rejecting
7   the . . . doctors' uncontroverted conclusions" and instead making
8   "his own exploration and assessment as to claimant's physical
9   condition" even though he "was not qualified as a medical
10  expert"); Miller v. Astrue, 695 F. Supp. 2d 1042, 1048 (C.D. Cal.
11  2010) ("[I]n noting '[a]t the hearing, the claimant's thoughts
12  did not seem to wander and all questions were answered alertly
13  and appropriately[,]' the ALJ acted as his own medical expert,
14  substituting his opinion for [examining physician's] professional
15  interpretation of the clinical testing, which is improper."
16  (alterations in original)). Here, however, the ALJ did not
17  substitute his opinion for a medical expert's; rather, he
18  appropriately considered all of the medical evidence and
19  formulated an RFC that was consistent with it. (See AR 18-19
20  (summarizing evidence).) Moreover, as discussed above, in doing
21  so the ALJ permissibly relied on the opinions of Drs. Lee and
22  Ross. The ALJ therefore acted within his authority.
23  See Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) ("It
24  is clear that it is the responsibility of the ALJ, not the
25  claimant's physician, to determine residual functional
26  capacity."); 20 C.F.R. §§ 404.1546(c) ("[T]he administrative law
27  judge . . . is responsible for assessing your residual functional
28  capacity."), 416.946(c) (same).

1    Plaintiff is not entitled to remand on this ground.

2    B.   <u>The ALJ's Errors in Assessing Plaintiff's Credibility</u>

3         <u>Were Harmless</u>

4    Plaintiff contends that the ALJ improperly discounted her

5    credibility. (J. Stip. at 14-37.)

6         1.   <u>Applicable law</u>

7    An ALJ's assessment of symptom severity and claimant

8    credibility is entitled to "great weight."  <u>See</u> <u>Weetman v.</u>

9    <u>Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989); <u>Nyman v. Heckler</u>, 779

10   F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to

11   believe every allegation of disabling pain, or else disability

12   benefits would be available for the asking, a result plainly

13   contrary to 42 U.S.C. § 423(d)(5)(A)."  <u>Molina v. Astrue</u>, 674

14   F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks

15   omitted).  In evaluating a claimant's subjective symptom

16   testimony, the ALJ engages in a two-step analysis.  <u>See</u>

17   <u>Lingenfelter</u>, 504 F.3d at 1035-36.  "First, the ALJ must

18   determine whether the claimant has presented objective medical

19   evidence of an underlying impairment [that] could reasonably be

20   expected to produce the pain or other symptoms alleged."  <u>Id.</u> at

21   1036 (internal quotation marks omitted).  If such objective

22   medical evidence exists, the ALJ may not reject a claimant's

23   testimony "simply because there is no showing that the impairment

24   can reasonably produce the *degree* of symptom alleged."  <u>Smolen v.</u>

25   <u>Chater</u>, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in

26   original).  When the ALJ finds a claimant's subjective complaints

27   not credible, the ALJ must make specific findings that support

28   the conclusion.  <u>See</u> <u>Berry v. Astrue</u>, 622 F.3d 1228, 1234 (9th

22

Cir. 2010).   Absent affirmative evidence of malingering, those
findings must provide "clear and convincing" reasons for
rejecting the claimant's testimony.   <u>Lester</u>, 81 F.3d at 834.   If
the ALJ's credibility finding is supported by substantial
evidence in the record, the reviewing court "may not engage in
second-guessing."   <u>Thomas</u>, 278 F.3d at 959.

### 2.   Relevant facts

In an undated disability report, Plaintiff wrote that she
was unable to work because of "[s]evere depression, anxiety
attacks, hepat[itis] c, bone spur on right foot, back problems,
arthritis in lower spine, [and] acid reflux."   (AR 245.)
Plaintiff said that her impairments made it hard to stand and
walk, she was always in pain, she cried all the time, and she
vomited a lot "because of the acid reflux."   (AR 246.)   In an
undated "Disability Report – Appeal," Plaintiff wrote that she
was "unable to walk, stand, bend for long periods due to spine
pain[,] (R) knee swells up[,] (R) leg numb too, more stressed and
depressed, anxiety, alcohol dep, chronic hepatitis, emphysema,
hypertension, esophageal reflux."   (AR 259.)   She wrote that she
needed help cooking for herself, doing chores, cleaning her
house, doing laundry, and shopping for food.   (AR 262.)   She
needed reminders to take her medication, and sometimes she was
"unable to get out of bed" because she had "too much pain, also
pain in legs due to restless leg syndrome."   (<u>Id.</u>)

At the July 15, 2010 hearing, Plaintiff testified that she
was unable to work because she had "chronic pain all the time,
constantly," in her lower back and hips.   (AR 58.)   She could sit
for a "little while" but then "ha[d] to kind of be able to wiggle

23

around a little bit," she couldn't "stand up very long at all,"
and she could "walk better than [she] stand[s]." (Id.)
Plaintiff testified that she often lost her balance because her
legs would grow numb and "feel like rubber bands." (AR 65.) She
could not walk a block at a reasonable pace on a surface that was
rough or uneven. (AR 66.) Her only side effect from her
medication was a "little bit of constipation." (AR 59.)

Plaintiff had a walker at the 2010 hearing and said she had
asked her doctor to prescribe it because she could not walk
around the store without stopping and because she was "afraid
[she] would fall out into the street and get run over."[18] (AR
59-60.) Plaintiff testified that she had been using the walker
for about a year. (Id.) At the time of the hearing she used the
walker every couple of days, when she and her husband took their
dogs for a walk, and she had previously used it about three days
a week. (AR 65, 70.) Plaintiff said she had had a seizure on
New Year's Eve a couple years earlier after drinking a beer (AR
61), and she had breathing problems but continued to smoke about
two-thirds or three-fourths of a pack of cigarettes a day (AR
71). Plaintiff stopped drinking alcohol in December 2008. (AR
72-73.)

On a typical day Plaintiff got up at around 6:30 a.m., made
and drank coffee, "t[ook] the blinds off all of the birds," took
her medication, played a hand-held solitaire game for about an
hour, and watched television "[a]ll day." (AR 54-57.) She could
start fixing her own meals but needed her husband to help finish

---

[18]   The record shows that Dr. Wu prescribed a walker "with
seat if possible" on November 25, 2008. (AR 448.)

them, and when working in the kitchen she sat on a stool so her legs would not "giv[e] out." (AR 55.) She could take care of her personal hygiene but used handrails and a chair in the shower. (Id.) Plaintiff vacuumed "once in a blue moon," cooked, and "sometimes" did the dishes. (Id.) She and her husband shopped for groceries for about 30 minutes three or four times a month; Plaintiff would "hop on one of [those] little carts" and her husband would "help[] [her] put everything in the basket." (AR 55-56.)

At the July 23, 2012 hearing, Plaintiff testified that she could not work because she had pain in her lower back and could not bend, her whole leg "goes to sleep," her knee "gives out," her back muscles tightened up, and she had muscle spasms in her legs and ankles. (AR 33.) Plaintiff's back pain was treated only with pain medication, which "dull[ed] the pain," but if she stood for very long "everything starts tightening up" and she would "get[]to the point where [she could] only walk so far" and had to "sit down and let [her] back settle down." (AR 33-34, 39.) She could sit for about a half hour before she would "start to squirm," and she could stand for only five or six minutes unless she was "leaning." (AR 38-39.) Plaintiff said she still had seizures "every now and again" but had not "had one in a while." (AR 40.)

Plaintiff testified that she had last used alcohol about four years earlier and had not used any other substance since before she was pregnant with her son, who was 25 years old at the time of the hearing. (AR 31-32.) Plaintiff testified that her daily activities included getting up in the morning and having

coffee, watching television, sleeping, playing a word puzzle, and taking her medication.  (AR 34, 37-38.)  She could not cook dinner (AR 34), and when she did cook she took a chair into the kitchen so she could sit down (AR 37).

### 3.  Discussion

The ALJ gave four reasons for discounting Plaintiff's credibility: (1) her activities of daily living were "inconsistent with [her] testimony regarding disability and demonstrate the capacity for work," (2) her testimony that she "did nothing all day" conflicted with her husband's report that she "tended to a bunch of birds," (3) her testimony that she required a walker, had significant difficulty moving around, and had debilitating back pain was inconsistent with the evidence of record, and (4) she received only "routine and conservative treatment for complaints of back pain."  (AR 17-18 (internal quotation marks omitted).)

Contrary to the ALJ's finding, Plaintiff's reported daily activities were not inconsistent with her asserted level of pain, nor did they indicate that she would be capable of performing full-time remunerative employment.  See Molina, 674 F.3d at 1113 (ALJ may discredit testimony when claimant "reports participation in everyday activities indicating capacities that are transferable to a work setting" or "contradict claims of a totally debilitating impairment").  Plaintiff consistently testified that she spent her days watching television, playing a hand-held game or word puzzle, and taking medication.  Although she sometimes cooked, she could not cook a meal by herself and needed to sit in a chair or on a stool while cooking.  Plaintiff

said she needed help doing chores, cleaning her house, doing laundry, and shopping for food.  (AR 262.)  None of these activities conflict with Plaintiff's testimony that her ability to stand and walk was significantly limited.  Indeed, the ALJ did not rely on them in his analysis, but instead cited Dr. Bernabe's opinion that Plaintiff could shop, travel alone, walk without a wheelchair or walker, use public transportation, climb steps, prepare simple meals, care for her own personal hygiene, and use paper.  (AR 17, 462.)  Because nothing indicates that Plaintiff actually performed all of those activities, however, the ALJ improperly relied on them to discredit her subjective complaints.

The ALJ also erroneously found that Plaintiff's testimony that she "essentially did nothing all day" was "inconsistent with the testimony of her husband," Woodrow Grisel, who testified that Plaintiff "tended to a bunch of birds."[19]  (AR 17 (internal quotation marks omitted).)  Woodrow in fact testified that Plaintiff "can't walk very far at all without having to sit down," complained about pain "all the time," and spent her days "[r]eading and playing a game, watching a little TV."  (AR 42-43.)  Woodrow testified that he did the laundry, helped her take a shower and wash her hair, drove her places, picked up her medication, and took care of their dogs.  (Id.)  Although Woodrow testified that Plaintiff had "some birds she tends to, a bunch of birds," and "tries to go out and sit with them — when she gets outside" (AR 43), it is not clear how sitting outside with her birds, or even feeding them, is inconsistent with any of

---

[19]    Because Plaintiff and her husband share the same last name, the Court refers to Plaintiff's husband by his first name.

1  Plaintiff's complaints.  Indeed, Plaintiff herself interjected
2  during Woodrow's testimony that it was "all [she] could do to get
3  out to [the birds]," and she had to have Woodrow give them food
4  and water.  (Id.)  As such, Plaintiff's subjective complaints do
5  not conflict with her husband's statement that she tended to her
6  birds.

7      The ALJ's other reasons for discounting Plaintiff's
8  credibility, however, are sufficiently clear and convincing.

9      First, the ALJ accurately noted that Plaintiff's testimony
10 that she had "significant difficulty moving around," required a
11 walker, and had debilitating back pain conflicted with the
12 objective medical evidence.  (AR 17-18.)  Plaintiff claimed that
13 she was so limited by her back pain that she was able to sit for
14 only 30 minutes at a time, stand for only about five minutes
15 before needing to sit (AR 38-39), needed to use a walker two or
16 three days a week (AR 59-60, 64-65), and was sometimes unable to
17 get out of bed because of pain (AR 262).  Her husband similarly
18 testified that Plaintiff "can't walk very far at all" without
19 needing to sit down.  (AR 42-43.)  But in February 2009, Dr.
20 Girgis examined Plaintiff's back and found equal muscle tone,
21 normal range of motion, and no tenderness or spasm (AR 358-59);
22 he also noted that Plaintiff had good tone and motion and 5/5
23 strength throughout her body (AR 359).  Dr. Girgis further
24 observed that Plaintiff "walks and moves easily," had a "normal"
25 gait that was "not unsteady or unpredictable," was "able to
26 change position and get on and off the examining table without
27 difficulty," and needed "[n]o assistive device . . . for
28 ambulation across the room."  (AR 360.)  Moreover, in May 2012,

Dr. Bernabe, an orthopedic surgeon, noted several positive examination findings but also observed that Plaintiff "moved freely in and out of the office and around the examination room without the use of any assistive device," her gait was normal, and she could "toe and heel walk." (AR 453.) Indeed, Dr. Bernabe concluded that despite her back impairment, Plaintiff could stand and walk for two hours at a time and a total of six hours in an eight-hour day. (AR 456, 458.) The ALJ therefore permissibly discounted Plaintiff's credibility based on the conflict between her statements and the objective medical evidence.[20] See Carmickle, 533 F.3d at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in determining credibility, ALJ may consider "whether the alleged symptoms are consistent with the medical evidence").[21]

---

[20]     Plaintiff argues that she never contended she couldn't walk even short distances, only that she had trouble with "prolonged" or "extended" walking. (J. Stip. at 20, 25-27.) As an initial matter, this contention is arguably inconsistent with her claim that the ALJ should have credited Dr. Girgis's finding that she needed "frequent stops" when walking. In any event, the argument is demonstrably inaccurate given Plaintiff's statements that she was sometimes "unable to get out of bed" because of pain (AR 262), she could not walk a block at a reasonable pace on a surface that was rough or uneven (AR 66), she needed a walker because she could not walk "all the way around" a store without stopping (AR 59-60), she could "only walk so far" without needing to sit (AR 34), she could not walk farther than to the corner store even with her walker (AR 70), and it was "all [she] could do" to go outside to sit with her birds and she could not even feed or water them (AR 43).

[21]     Plaintiff's testimony regarding her substance use also conflicted with statements in her medical records. At the July 2012 hearing, Plaintiff testified that she had stopped using alcohol about four years earlier and had not used any other

The ALJ also permissibly discounted Plaintiff's credibility because she received only "routine and conservative treatment for complaints of back pain."[22]   (AR 18); see Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (ALJ may infer that claimant's "response to conservative treatment undermines [claimant's] reports regarding the disabling nature of his pain"); Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (doctor's prescribed "conservative treatment" suggested "lower level of both pain and functional limitation").   Plaintiff's back condition was treated with physical therapy (AR 446-47) and

---

substance for over 25 years.   (AR 31-32.)   But after suffering a seizure in December 2008, Plaintiff told paramedics that she had been "smoking marijuana prior to the seizure" and had been drinking alcohol the previous day.   (AR 343.)   In February 2009, she told examining psychologist Debra George-Barber that she had last used alcohol in May 2008 and last used "speed, and methamphetamines" two years earlier (AR 349); that same month, she reported to Dr. Girgis that she had no history of alcohol abuse (AR 357).   Because the ALJ did not rely on these inconsistencies in assessing Plaintiff's credibility, the Court does not either.   See Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1225 (9th Cir. 2009) (district court must "review the ALJ's decision based on the reasoning and factual findings offered by the ALJ").

[22]   Plaintiff argues that her "conservative treatment" should not be considered because "[t]he ALJ did not give that as a reason" for discounting her credibility (J. Stip. at 34), but the ALJ clearly did, stating,

> The credibility of the claimant's allegations regarding the severity of her symptoms and limitations is diminished because those allegations are greater than expected in light of the objective evidence of record. The medical evidence indicates the claimant received routine and conservative treatment for complaints of back pain.

(AR 17-18.)

medication, including at various times the narcotics Norco (AR 287-88, 291, 396, 445, 490, 492-93), Percocet (AR 393), oxycodone (AR 394), morphine (445-46, 490, 492-93), methadone (AR 447), and hydromorphone (AR 464, 466, 470, 472-73, 475).[23]   Although treatment with narcotic pain relievers has generally been found to be nonconservative when combined with other treatments — such as surgery, steroid or epidural injections, or referral for necessary further treatment — here Plaintiff was never advised to seek any additional treatment for her back, such as surgery or pain management,[24] and she testified that her medications in fact

---

[23]   Norco is a combination of acetaminophen and hydrocodone, Hydrocodone, MedlinePlus, http://www.nlm.nih.gov /medlineplus/druginfo/meds/a601006.html (last updated May 15, 2013), and Percocet is a combination of acetaminophen and oxycodone, Oxycodone, MedlinePlus, http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682132.html (last updated Sept. 15, 2013).   Hydrocodone, oxycodone, morphine, and methadone are narcotic analgesics used to relive moderate to severe pain. Hydrocodone, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a601006.html (last updated May 15, 2013); Oxycodone, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a682132.html (last updated Sept. 15, 2013); Morphine Oral, MedlinePlus, http://www.nlm.nih.gov/medlineplus /druginfo/meds/a682133.html (last updated Sept. 15, 2013); Methadone, MedlinePlus, http://www.nlm.nih.gov/medlineplus /druginfo/meds/a682134.html (last updated Feb. 28, 2014). Hydromorphone, or Dilaudid, is a narcotic analgesic used to relieve pain.   Hydromorphone, MedlinePlus, http://www.nlm.nih. gov/medlineplus/druginfo/meds/a682013.html (last updated Feb. 28, 2014).

[24]   Indeed, Dr. James Evans, one of Plaintiff's treating physicians, noted that "[t]wo doctors had told her that her other options were surgery, however, neither one of them were entirely convinced that surgery would be appropriate for the patient." (AR 475.)   In May 2010, a doctor discussed "possible injections" with Plaintiff but noted that Plaintiff "does not want injections [at] this time."   (AR 446.)   And in January 2011, Plaintiff was referred for additional treatment but none was related to her back condition.   (See AR 490 (referrals to surgery for "fatty

dulled the pain and did not result in any side effects other than a "little constipation."[25]  (AR 34, 59); see Tommasetti, 533 F.3d at 1040 (ALJ permissibly discounted credibility when claimant "responded favorably to conservative treatment including physical therapy and the use of anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset"); Huizar v. Comm'r of Soc. Sec., 428 F. App'x 678, 680 (9th Cir. 2011) (ALJ permissibly discounted claimant's credibility because her "physical and mental impairments responded favorably to conservative treatment," which included "the use of narcotic/opiate pain medications" (emphasis omitted)); compare Lapeirre-Gutt v. Astrue, 382 F. App'x 662, 664 (9th Cir. 2010) (treatment with narcotic pain medication, occipital nerve blocks, trigger-point injections, and cervical-fusion surgery not conservative); Samaniego v. Astrue, No. EDCV 11-865 JC, 2012 WL 254030, at *4 (C.D. Cal. Jan. 27, 2012) (treatment with narcotic pain medication, regular trigger-point injections, and occasional epidural injections not conservative, noting that doctor also "recommended significantly invasive surgery for plaintiff's back").  The ALJ therefore did not err in relying on Plaintiff's limited treatment to discount the credibility of her complaints of a totally disabling back

---

liver," "PM&R" — presumably, physical medicine and rehabilitation — for injection of bone spur, and neurology for follow-up of history of seizures).)

[25]    Woodrow testified that he did not see Plaintiff have any side effects from her medications.  (AR 42.)

impairment.[26]  Indeed, this Court may not "second guess" the
ALJ's credibility finding even if the evidence of Plaintiff's
treatment was susceptible of other interpretations more favorable
to Plaintiff.  See Tommasetti, 533 F.3d at 1039.

Because the ALJ provided two valid reasons for finding
Plaintiff not credible, any errors in his credibility assessment
were harmless.  See Carmickle, 533 F.3d at 1162 (when ALJ
provides specific reasons for discounting Plaintiff's
credibility, decision may be upheld even if certain reasons were
invalid as long as "remaining reasoning and ultimate credibility
determination" were supported by substantial evidence (emphasis
omitted)).  Plaintiff is not entitled to remand on this ground.

C.    The ALJ Permissibly Discounted Woodrow's Lay Testimony

Plaintiff contends that the ALJ erroneously discounted the
credibility of her husband, Woodrow.  (J. Stip. at 40-49.)

---

[26]    Plaintiff contends that the ALJ erroneously relied on a
December 31, 2008 emergency note because the record was "not a
progress note, it [was] a note incidental to emergency care for a
seizure." (J. Stip. at 30.)  But nothing in that note indicates
that it was less reliable for being an emergency-room record.
Moreover, it reflects that Plaintiff reported her history of
"chronic back pain" but nevertheless said she was having no pain
(AR 332) and that an emergency-room doctor assessed her as having
normal motor function and gait (AR 334).  Moreover, although
Plaintiff contends that her treatment records "document[]
complaints [of] pain on every other day she saw a physician,
despite her narcotic pain medications" (J. Stip. at 30), several
medical records make no notation at all of her back pain (see,
e.g., AR 285-86, 288-89, 292-94, 297-98, 489).  Moreover, one
note states her back pain was "stable" and that she should
"cont[inue] meds" (AR 295-96), another appears to indicate that
her back pain is "now better" with medication (AR 445), and one
notes her "chronic back pain" and that she is "addicted to
morphine" (AR 490).

### 1.   Applicable law

"In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009) (quoting Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006) (internal quotation marks omitted)); see also §§ 404.1513(d) (statements from therapists, family, and friends can be used to show severity of impairments and effect on ability to work), 416.913(d) (same).  Such testimony is competent evidence and "*cannot* be disregarded without comment." Bruce, 557 F.3d at 1115 (quoting Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996) (internal quotation marks omitted)); Robbins, 466 F.3d at 885 ("[T]he ALJ is required to account for all lay witness testimony in the discussion of his or her findings.").  When rejecting the testimony of a lay witness, an ALJ must give specific reasons that are germane to that witness. Bruce, 557 F.3d at 1115; see also Stout, 454 F.3d at 1053; Nguyen, 100 F.3d at 1467.

### 2.   Discussion

As discussed in Section B.3 above, Woodrow testified that Plaintiff couldn't "walk very far at all without having to sit down," complained about pain "all the time," and was unable to do household chores like cooking and laundry.  (AR 42.)  He asserted that Plaintiff did not go grocery shopping, needed his help showering and washing her hair,[27] and spent her days reading,

---

[27]   Woodrow's assertion that Plaintiff did not go grocery shopping and needed help showering and washing her hair (AR 42) conflicted with Plaintiff's previous testimony that she and

"playing a game," watching television, and sometimes tending to or sitting with her birds.  (AR 42-43.)  Woodrow had to do the laundry "and everything," pick up Plaintiff's "pills and stuff," drive her, help her shower and wash her hair, take care of their dogs, and do the grocery shopping and "whatever she needs.[28]  (AR 36, 42-43.)

The ALJ permissibly discounted Woodrow's testimony because it was "less persuasive" than "the opinions of medical professionals relied on" in the decision and was "not supported by the clinical or diagnostic medical evidence that is discussed elsewhere in [the] decision."  (AR 20.)  Indeed, like Plaintiff's, Woodrow's testimony was inconsistent with Drs. Girgis's and Bernabe's findings that Plaintiff had a normal gait, was able to move freely about the examination room, and could walk for six hours in an eight-hour day.  And like Plaintiff's, Woodrow's testimony that Plaintiff experienced disabling pain was inconsistent with medical records showing that Plaintiff received only routine and conservative treatment.  This was therefore a germane reason for discounting Woodrow's testimony.  See Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005) ("inconsistency with medical evidence" is germane reason for discounting lay-witness testimony); Carter v. Astrue, 472 F. App'x 550, 553 (9th Cir. 2012) ("We have held that inconsistency with medical evidence is a germane reason to reject lay testimony."); see also

Woodrow did the grocery shopping together and that she could shower herself using shower handrails and a chair (AR 55).

[28]    Nonetheless, Woodrow testified that he did not work because he was "disabled from Vietnam."  (AR 32.)

1  <u>Molina</u>, 674 F.3d at 1114 ("if the ALJ gives germane reasons for
2  rejecting testimony by one witness, the ALJ need only point to
3  those reasons when rejecting similar testimony by a different
4  witness").

5       Plaintiff contends that inconsistency with the record
6  evidence was not a germane reason for discounting Woodrow's
7  testimony because "the lack of supporting medical evidence is not
8  a legitimate reason for rejecting lay testimony about the
9  severity of symptoms." (J. Stip. at 47.)  But although the Ninth
10 Circuit has held that a mere <u>lack</u> of supporting evidence is not a
11 germane reason for discounting a lay witness's testimony, <u>see</u>
12 <u>Smolen</u>, 80 F.3d at 1289, it has also repeatedly held that
13 <u>inconsistency or contradiction</u> with the medical evidence <u>is</u> a
14 germane reason, <u>see</u> <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1395 (9th
15 Cir. 1984) ("The ALJ properly discounted lay testimony that
16 conflicted with the available medical evidence."); <u>see also</u>
17 <u>Bayliss</u>, 427 F.3d at 1218 ("inconsistency with medical evidence"
18 is a germane reason); <u>Carter</u>, 472 F. App'x at 553 (same); <u>Barton</u>
19 <u>v. Astrue</u>, 500 F. App'x 607, 609 (9th Cir. 2012) ("The ALJ's
20 finding that the lay opinion testimony conflicted with the
21 medical evidence was a 'germane reason' for rejecting this
22 testimony." (alteration omitted)); <u>see generally</u> <u>Rivera v.</u>
23 <u>Colvin</u>, No. 6:12-cv-02132-MO, 2013 WL 6002445, *2-*4 (D. Or. Nov.
24 12, 2013) (discussing <u>Smolen</u> and <u>Vincent</u> lines of cases).  Here,
25 the medical evidence is clearly inconsistent with Woodrow's
26 testimony; indeed, the ALJ specifically noted that Woodrow's
27 testimony was "less persuasive" than the credited medical
28 opinions and referred to earlier discussions of the evidence (AR

36

19), which pointed out that Plaintiff's asserted difficulty moving around and disabling back pain were "inconsistent with the evidence of record" in various ways (AR 17-18).[29]

The ALJ also found that Woodrow's opinion was "not an unbiased one because he has a familial motivation to support [Plaintiff] as well as a financial interest in seeing [her] receive benefits in order to increase the household income." (AR 20.)   It is not clear whether, in context, this was a valid reason to discount Woodrow's testimony.   The Ninth Circuit has held that a lay witness's familial relationship or abstract financial interest in the claimant's receipt of benefits is not in itself a sufficient reason for rejecting his testimony.   See Smolen, 80 F.3d at 1289 ("The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony."); Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) (ALJ may not rely on "characteristics common to all spouses" to discount spouse's testimony).   But here, in addition to noting Woodrow's "familial motivation" and "familial interest" in seeing Plaintiff obtain benefits, the ALJ noted that his testimony was inconsistent with the medical evidence, which tended to show that Woodrow was in fact exaggerating Plaintiff's

---

[29]   In any event, even if the ALJ erroneously found that Woodrow's testimony was unsupported by — rather than inconsistent with — the evidence, it was harmless because the ALJ explicitly rejected Plaintiff's testimony as inconsistent with the medical evidence in various ways (AR 17), and those reasons apply equally to Woodrow's similar testimony.   See Molina, 674 F.3d at 1122 (ALJ's failure to comment on lay-witness testimony harmless when "the same evidence that the ALJ referred to in discrediting the claimant's claims also discredits the lay witness's claims" (alteration and internal quotation marks omitted).)

symptoms.  See Valentine, 574 F.3d at 694 ("evidence that a specific spouse exaggerated a claimant's symptoms *in order* to get access to his disability benefits, as opposed to being an 'interested party' in the abstract, might suffice to reject that spouse's testimony").

Moreover, the Ninth Circuit has found that a lay witness's close relationship and possible financial interest in the outcome of a claim, when combined with inconsistency with the medical evidence, are germane reasons for discounting a witness's testimony.  See Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006) (ALJ permissibly discounted lay witness's testimony based on "inconsisten[cy]" with medical evidence, her "close relationship" with claimant, and possibility she was "influenced by her desire to help [the claimant]" (alteration and internal quotation marks omitted)); Rusten v. Comm'r of Soc. Sec. Admin., 468 F. App'x 717, 719 (9th Cir. 2012) (AlJ's observations that lay witnesses' testimony "was at odds with the preponderance of the medical evidence," that claimant's "mother and ex-wife could not be considered disinterested witnesses," and that "their statements were likely colored by affection for him" were germane reasons for discounting testimony).  Indeed, the evidence tends to show that Woodrow in fact had a significant financial interest in Plaintiff's claim for benefits: Plaintiff testified that she was "living off" her husband, whose sole source of income was veterans benefits, and that they had been forced to "give up the house and move in with [her] mom and [her] sister."  (AR 32, 35.)

But even if the ALJ erred by relying on Woodrow's interest in Plaintiff's receipt of benefits, it was harmless because the

1  ALJ provided a different germane reason for rejecting Woodrow's

2  testimony — that it was inconsistent with the medical evidence of

3  record.  See Valentine, 574 F.3d at 694; see also Molina, 674

4  F.3d at 1115 (ALJ's error harmless when "inconsequential to the

5  ultimate nondisability determination" (internal quotation marks

6  omitted)).

7      Plaintiff is not entitled to remand on this ground.

8  **VI.   CONCLUSION**

9      Consistent with the foregoing, and pursuant to sentence four

10 of 42 U.S.C. § 405(g),[30] IT IS ORDERED that judgment be entered

11 AFFIRMING the decision of the Commissioner and dismissing this

12 action with prejudice.  IT IS FURTHER ORDERED that the Clerk

13 serve copies of this Order and the Judgment on counsel for both

14 parties.

15

16

17

18 DATED: April 2, 2014

   _____

   JEAN ROSENBLUTH

19 U.S. Magistrate Judge

20

21

22

23

24

25

_____

26 [30]    This sentence provides: "The [district] court shall
   have power to enter, upon the pleadings and transcript of the
27 record, a judgment affirming, modifying, or reversing the
   decision of the Commissioner of Social Security, with or without
28 remanding the cause for a rehearing."